ATTORNEYS FOR APPELLANT
FILTER SPECIALISTS
Timothy W. Woods
Jones Obenchain, LLP
South Bend, Indiana

ATTORNEYS FOR APPELLEES
DAWN BROOKS AND
CHARMAINE WEATHERS
Jay Lauer
South Bend, Indiana

Shaw R. Friedman
Friedman & Associates, P.C.
LaPorte, Indiana

ATTORNEY FOR APPELLEE
MICHIGAN CITY HUMAN RIGHTS
COMMISSION
Lawrence W. Arness
Michigan City, Indiana

---

# In the
# Indiana Supreme Court

**FILED**

May 21 2009, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

### No. 46S05-0808-CV-444

FILTER SPECIALISTS, INC.,

*Appellant (Petitioner below),*

v.

DAWN BROOKS AND
CHARMAINE WEATHERS,

*Appellees (Respondents below).*

and

MICHIGAN CITY HUMAN RIGHTS
COMMSSION,

*Appellee (Intervenor-below).*

Appeal from the LaPorte Circuit Court, No. 46C01-0509-MI-290
The Honorable Thomas Alevizos, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 46A05-0704-CV-203

**May 21, 2009**

**Rucker, Justice.**

**Case Summary**

Dawn Brooks and Charmaine Weathers initiated these proceedings by filing a complaint with the Michigan City Human Rights Commission alleging their employer, Filter Specialists, Inc., discharged them on the basis of race, in violation of the Indiana Civil Rights Act. Both Brooks and Weathers are African-American. Following a hearing at which evidence was presented, a five-member Commission unanimously concluded that race was the motivating factor behind the claimants' discharge, and awarded damages to Brooks and Weathers in the form of backpay and fringe benefits. Upon judicial review, the trial court affirmed the Commission's decision. We affirm in part and reverse in part the judgment of the trial court.

**Background**

Before delving into the specific facts of this case, we begin by summarizing some basic principles in an area of law that at least one commentator observed "has befuddled most of those who have attempted to master it." Kenneth R. Davis, *Price*-Fixing: Refining the *Price Waterhouse* Standard and Individual Disparate Treatment Law, 31 Fla. St. U. L. Rev 859, 859 (2004); see also Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999) (plurality opinion) (commenting, "Employment discrimination law has become an area of great-and often needless-complexity in the federal courts").

Every employment decision involves discrimination. An employer, when deciding whom to hire, whom to promote, or whom to fire, must discriminate among employees. Permissible bases for discrimination in firing for example might include excessive absenteeism, horseplay, fighting, or as alleged in this case and discussed in more detail below, clocking-in a fellow employee. Under Indiana law impermissible bases for discrimination include "race, religion, color, sex, disability, national origin, or ancestry." Ind. Code § 22-9-1-3(l). Thus, in an employment discrimination lawsuit, the critical inquiry usually is: On what basis did the employer discriminate? Stated somewhat differently, the case is one of causation: What caused the adverse employment action of which the plaintiff complains?

In construing Indiana civil rights law our courts have often looked to federal law for guidance. See, e.g., State, Civil Rights Comm'n v. County Line Park, Inc., 738 N.E.2d 1044, 1048 (Ind. 2000); Indiana Civil Rights Comm'n v. Culver Educ. Found., 535 N.E.2d 112, 115-16 (Ind. 1989); Indiana Civil Rights Comm'n v. City of Muncie, 459 N.E.2d 411, 418 (Ind. Ct. App. 1984). We do so again here.

There are presently two alternative ways of establishing liability in a federal Title VII case.[1] A plaintiff may pursue a "single-motive" theory of discrimination. Or a plaintiff may pursue a "mixed-motive" theory of discrimination. Using the traditional single-motive theory, a plaintiff proves an unlawful employment practice pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as explicated in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). More precisely, with the goal of "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrimination," id. at 255 n.8, the United States Supreme Court in McDonnell Douglas established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases. The plaintiff in such a case must first establish a "prima facie" case of racial discrimination.[2] Burdine, 450 U.S. at 252-53. Once the plaintiff has established a prima facie

---

[1] Title VII of the Civil Rights Act of 1964 makes it illegal for an employer "to fail or refuse to hire or to discharge" a person "because of . . . race, color, religion, sex, or national origin." 42 U.S.C § 2000e-2(a)(1). This is similar to the Indiana Civil Rights Act, which makes it illegal to exclude a person "from equal opportunities because of race, religion, color, sex, disability, national origin, or ancestry." I.C. § 22-9-1-3(l).

[2] In McDonnell Douglas the plaintiff alleged that he was not *hired* because of his race. Under those circumstances the Supreme Court declared the employee could establish a prima facie case of employment discrimination by establishing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802.

The required elements of a prima facie case may vary depending on the case. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 511-12 (2002). And even in cases alleging discrimination in firing, courts differ on the precise elements of the plaintiff's prima facie case. See, e.g., Jones v. Reliant Energy-ARKLA, 336 F.3d 689, 691 (8th Cir. 2003) (for prima facie claim of disparate treatment based on race, a plaintiff must prove: "1) she is within the protected class, 2) she was qualified to perform her job, 3) she suffered an adverse employment action, and 4) non-members of her class, e.g., white employees, were treated differently"); Logan v. Caterpillar, Inc., 246 F.3d 912, 919 (7th Cir. 2001) (in a case involving discharge on basis of sex court declared that plaintiff must establish that "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated females"); Jackson v.

case, unlawful discrimination is presumed. The defendant-employer can rebut this presumption by producing evidence that the adverse employment action was taken "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. Should the defendant-employer carry this burden, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant-employer are but a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804. Although the McDonnell Douglas presumption shifts the burden of production to the defendant-employer, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

In contrast, using the mixed-motive theory a plaintiff can establish an unlawful employment practice by showing that impermissible discrimination played a "motivating part" or was a "substantial factor" in the employment decision. Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Under this theory the plaintiff need not disprove the *bona fides* of the employer's justifications but rather argues that race (or some other impermissible factor) was also a factor motivating the adverse action. See 42 U.S.C. § 2000e-2(m). In a mixed motive case, rather than simply articulating a legitimate, nondiscriminatory reason for the employment decision, the defendant must show by a preponderance of the evidence that it would have made the same decision regardless of the plaintiff's protected status. Price Waterhouse, 490 U.S. at 258.

This means of proving unlawful discrimination was brought into focus by the United States Supreme Court in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), which referred to a "mixed-motive" case as one in which "both legitimate and illegitimate reasons motivated the decision." Id. at 93. In Desert Palace, the Court noted that "[t]his case provides us with the first opportunity to consider the effects of the 1991 Act [amending Title VII] on jury instructions in mixed-motive cases." Id. at 98. The amendment in question declared, "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the

---

E.J. Brach Corp., 176 F.3d 971, 982-83 (7th Cir. 1999) (declaring that to establish prima facie claim for discharge based on race and age plaintiff must show: "(1) he was in a protected class; (2) he performed his job well enough to meet his employer's legitimate expectations; (3) despite his performance, he was discharged; and (4) [] his employer sought a replacement for him . . .").

practice." 42 U.S.C. § 2000e-2(m); see also Desert Palace, 539 U.S. at 94 (quoting statute). The Court explained the issue presented by the amendment:

> Since the passage of the 1991 Act, the Courts of Appeals have divided over whether a plaintiff must prove by direct evidence that an impermissible consideration was a "motivating factor" in an adverse employment action. See 42 U.S.C. § 2000e-2(m). Relying primarily on Justice O'Connor's concurrence in Price Waterhouse [v. Hopkins, 490 U.S. 228 (1989)], a number of courts have held that direct evidence is required to establish liability under § 2000e-2(m).

Desert Palace, 539 U.S. at 95. A unanimous Court held that "direct evidence" is not required in order for a plaintiff to obtain a mixed-motive instruction under Title VII. Id. at 101-02. The Court summarized its holding as follows:

> In order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Because direct evidence of discrimination is not required in mixed-motive cases, the Court of Appeals correctly concluded that the District Court did not abuse its discretion in giving a mixed-motive instruction to the jury.

Id. at 101-02. Although this holding purported to address only when a plaintiff is entitled to a mixed-motive jury instruction, some courts have concluded that the holding has a much broader impact. Specifically, some courts have read Desert Palace to apply to "single-motive" as well as "mixed-motive" cases. See, e.g., Dare v. Wal-Mart Stores, Inc., 267 F. Supp. 2d 987, 990-92 (D. Minn. 2003). Some have read it to spell the demise of the McDonnell Douglas burden-shifting paradigm altogether. See, e.g., Griffith v. City of Des Moines, 387 F.3d 733, 745 (8th Cir. 2004) ("The only rational conclusion is that no distinction between single motive and mixed motives exists . . . McDonnell Douglas should not be used by courts to analyze Title VII claims.") (Magnuson, District J., concurring). And some have noted the uncertain ground on which McDonnell Douglas now stands. Chadwick v. WellPoint, Inc., 561 F.3d 38, 45 n.8 (1st Cir. 2009) (noting, "The Desert Palace decision has proved ripe terrain for scholarly debate over how that decision interacts with the McDonnell Douglas framework").

Although we do not agree that <u>Desert Palace</u> completely overruled <u>McDonnell Douglas</u>,[3] we agree with those courts that have concluded in light of <u>Desert Palace</u>, the traditional <u>McDonnell Douglas</u> burden-shifting paradigm requires a slight modification, but only in its final stage. See, e.g., <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305, 312 (5th Cir. 2004) (noting courts need "only modify the final stage of the <u>McDonnell Douglas</u> scheme to accommodate <u>Desert Palace</u>, by framing the final stage 'in terms of whether the plaintiff can meet his or her 'ultimate burden' to prove intentional discrimination, rather than in terms of whether the plaintiff can prove 'pretext.'") (quoting <u>Rishel v. Nationwide Mut. Ins. Co.</u>, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)).

Under the traditional paradigm, as a practical matter, if the defendant's proffered explanation for its conduct is true, then the result is victory for the defendant. On the other hand if the defendant's proffered explanation is false, or in the words of <u>McDonnell Douglas</u> a "pretext," then the result is often victory for the plaintiff.[4] Under a modified framework, to prevail after the defendant produces a legitimate, nondiscriminatory reason for its conduct, the plaintiff must prove by a preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (single-motive alternative), see <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43 (2000) (once employer offers its nondiscriminatory reason "the <u>McDonnell Douglas</u> framework-with its presumptions and burdens-disappeared, and the sole remaining issue was 'discrimination *vel non*.'") (internal quotation omitted), or (2) that the defendant's reason, while true, is only *one* of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). 42 U.S.C. § 2000e-2(m). This latter showing may be made with either "direct" or "circumstantial" evidence. <u>Desert Palace</u>, 539 U.S. at 101-02. If the plaintiff prevails under the *second* alternative, then the burden shifts to the defendant who may limit the remedies available to the plaintiff to injunctive relief, attorney's fees, and costs-*i.e.,* to escape liability for damages-by proving it "would have taken the same action in the absence of the impermissible motivating

---

[3] Indeed <u>Desert Palace</u> does not mention <u>McDonnell Douglas</u> and left open the question of "when, if ever, [42 U.S.C. § 2000e-2(m)] applies outside of the mixed-motive context." 539 U.S. at 94 n.1. And, the Supreme Court applied the <u>McDonnell Douglas</u> framework in a post-<u>Desert Palace</u> case without mentioning <u>Desert Palace</u>. See <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44 (2003).

[4] But see <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993) (holding that the trier of fact's rejection of an employer's asserted reason for its actions doesn't entitle a plaintiff to judgment as a matter of law).

factor." 42 U.S.C. § 2000e-5(g)(2)(B). With these principles in mind, we now turn to the facts of this case.

## Facts

Dawn Brooks and Charmaine Weathers (referred to collectively as "Employees") worked at Filter Specialists, Inc., ("Company") – a manufacturer and distributor of a variety of filtration products. Brooks had worked for Company two years, and Weathers seven. On the morning of March 5, 2003, the two women arrived at the factory at approximately 7:00 a.m., the time their shift began. Weathers, who was driving, stopped her car near entrance no. 1 and dropped Brooks off. Weathers then parked her car and entered the factory at entrance no. 2.

Diana Wirtz, Company's human resource manager, arrived around the same time and saw Weathers exit her car and walk toward entrance no. 2. Wirtz testified she (Wirtz) entered the facility through entrance no. 1 and waited for Weathers by the time clock, but Weathers never showed up. At this point Wirtz became suspicious and checked the Company's time-clock records. They indicated that Brooks and Weathers were clocked in on the same time clock at 7:01 a.m.

The Company has two time clocks, one of which is located near entrance no. 1, and the other near entrance no. 2. Workers clock-in by entering their employee number followed by the "enter" key. The clock-in time is shown in hours and minutes but not seconds; so, it is possible for two employees' clock-in times to be recorded as the same minute, even though the clock-ins did not occur simultaneously. Company's employee handbook treats clocking in for another employee, or having one employee clock in for another, as a time card violation. The handbook provides that such a violation "<u>will</u> carry the penalty of immediate suspension and/or discharge." Appellant's App. at 154 (emphasis in original).

Wirtz contacted Mike Forbes, Company's production manager, who supervised both Employees. Wirtz informed Forbes that she had concluded Employees had committed time-clock fraud that morning and recommended their termination. But Forbes considered Employees as good workers and responded that he did not want to fire them. Unable to agree, Wirtz and Forbes took the matter to Bernie Faulkner, Company's chief operating officer. After discussing the matter, the three decided against termination provided the women sign a "last-chance

7

agreement" admitting a time-card violation. Appellant's App. at 148. Specifically, Brooks was accused of clocking-in Weathers; and Weathers was accused of having Brooks do so. When separately presented with the proposed agreement both women refused to sign and adamantly denied violating Company's time-clock policy. Nevertheless, Forbes terminated them that day even though neither had any history of fraud or misrepresentation, and neither would have been subject to discharge for arriving at work late that day.

Thereafter, Employees filed a complaint with the Michigan City Human Rights Commission alleging they were discharged because of race. The Commission held a hearing on April 20, 2005. On August 18, 2005, a five-member Commission entered a unanimous decision finding that Company had discriminated against the two women based on their race, and awarded damages in the form of backpay and fringe benefits. Along with its decision, the Commission entered the following relevant conclusions:

> 3.      The Claimants in this case have met the burden of proof to establish a prima facie case of racial discrimination. Both claimants are African American women, who, according to the supervisor, Mr. Forbes, were good employees that the company did not want to lose. The testimony provided during the hearing in this matter further demonstrates that other Caucasian employees of the company who engage in far more egregious behavior than that the Claimants were accused of received far less severe forms of discipline by the company for their actions. In fact, Mr. Forbes testified that he did in fact have the choice of either suspending or terminated the Claimants in this matter, and he chose to terminate them. Finally, the Claimants have proven that the company did in fact take adverse employment action against them, to-wit: termination of their employment . . . . As the company chose to terminate the claimants for the alleged offense, this constitutes an adverse employment action against them. As such, the Claimants have met all burdens of proof necessary in order to establish a prima facie case of racial discrimination.
>
> 4.      In fact, as noted in Exhibits E and F to the hearing transcript in this case, the Michigan City Human Rights Department, following an investigation into the claimants allegations of racial discrimination, did in fact find probable cause existed to support the Claimants charges, noting in their findings the lack of eyewitnesses to the alleged incident, the fact that the time clock records reflected other employees punching in at the

8

same time on occasion and the lack of discipline for those employees.

\* \* \*

Conclusion

The testimony and evidence presented during the hearing clearly support the claimants' position in this matter. The company has failed to provide sufficient evidence to support their termination of the claimants. The company itself admitted that they have no witnesses who actually saw the alleged time clock incident, and also admits that with two time clocks in the facility, it is possible for more than one individual to have punched in at the same time, either utilizing the same time clock or separate clocks. The company further admits that neither of these employees had any history of fraud or misrepresentation during their tenure with the company, and in fact both adamantly denied this incident. In addition, neither claimant was in danger of being terminated due to point accumulation even had they both punched in late that day. The company can offer no evidence or witnesses to support their position in this matter, and have completely failed to provide any legitimate, non-discriminatory reason for the Claimant's discharge. In fact, other employees received much less discipline for far greater offenses, including throwing tools at another employee and even walking off the job. Yet, the company chose to terminate the Claimants in this matter, for an alleged offense which no one witnessed and that the evidence fails to support, and which the Claimant's denied. It is clear from the evidence in this matter that the stated reasons by the company for termination were pretextual and it was in fact the Claimant's race which was the motivating factor behind their discharge.

Appellant's App. at 11-13.

Company filed a Petition for Review in the LaPorte Circuit Court. And the Commission filed a motion to be joined as a party-defendant, which the trial court granted. After conducting several hearings the trial court determined that the Commission's findings of fact were supported by the evidence and reasonable inferences therefrom. The trial court upheld the Commission's determination except with respect to the amount of damages. After remand to the Commission for supplemental findings, the trial court amended the damages award, but otherwise upheld the Commission's decision. On review, a divided panel of the Court of Appeals reversed the judgment of the trial court. See Filter Specialists, Inc. v. Brooks, 879 N.E.2d 558 (Ind. Ct. App.

9

2007). Having previously granted transfer we now affirm in part and reverse in part the judgment of the trial court.

## Standard of Review

Appellate courts stand in the same position as that of the trial court when reviewing a decision of an administrative agency. Weatherbee v. Indiana Civil Rights Comm'n, 665 N.E.2d 945, 947 (Ind. Ct. App. 1996). The Michigan City Human Rights Commission was created pursuant to the authority granted in Ind. Code section 22-9-1-12.1. Among other things the statute provides that a decision of the Commission may be appealed under the terms of Ind. Code section 4-21.5 – the Administrative Orders and Procedures Act. In relevant part the Act provides:

> The court shall grant relief . . . only if it determines that a person seeking judicial relief has been prejudiced by an agency action that is:
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law, or
>
> (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d). In sum, the trial court's and this Court's review of the Commission's decision "is limited to consideration of (1) whether there is substantial evidence to support the agency's finding and order and (2) whether the action constitutes an abuse of discretion, is arbitrary, capricious, or in excess of statutory authority." Indiana Civil Rights Comm'n v. Alder, 714 N.E.2d 632, 636 (Ind. 1999) (quoting Indiana Dep't of Envtl. Mgmt. v. Conard, 614 N.E.2d 916, 919 (Ind. 1993)). We give deference to the expertise of the agency and will not reverse simply because we may have reached a different result than the Commission. Alder, 714 N.E.2d at 635.

**Discussion**

Company raises five issues which we rephrase and reorder as: (1) should the Commission's decision be set aside because the local ordinance creating the Commission was not introduced into evidence; (2) was the Commission's decision concerning unlawful discrimination supported by sufficient evidence; (3) was the Commission's decision awarding backpay supported by sufficient evidence; (4) was Company subject to the Commission's jurisdiction; and (5) did the trial court err in granting Commission's motion to be joined as a party-defendant. We address issues (1) thru (3), and summarily affirm that portion of the Court of Appeals' opinion disposing of issues (4) and (5).

*The local ordinance*

The Michigan City Human Rights Commission was created pursuant to the authority granted by Ind. Code section 22-9-1-12.1. Among other things the statute provides, "Any city, town, or county is hereby authorized to adopt an ordinance or ordinances, which may include establishment or designation of an appropriate local commission, office, or agency to effectuate within its territorial jurisdiction the public policy of the state as declared in [I.C. § 22-9-1-2][5] without conflict with any of the provisions of this chapter." Company does not dispute that Michigan City adopted such an ordinance. In fact Company's lawyer referred to the ordinance just prior to the hearing in this case.[6] However, Company argues that because Employees did not introduce the ordinance into evidence, "the Employees failed to prove the terms of the Ordinance Filter is accused of violating . . . ." Appellant's Br. at 12. According to Company, "[w]hen an action against a company or individual is based on a city ordinance, it is incumbent upon the party charging violation of the ordinance to prove the terms of the ordinance and that the accused is subject to its terms." Id.

---

[5] Among other things the statute provides, "It is the public policy of the state to provide all of its citizens equal opportunity for education, employment, access to public conveniences and accommodations, and acquisition through purchase or rental of real property, including but not limited to housing, and to eliminate segregation or separation based solely on race, religion, color, sex, disability, national origin or ancestry, since such segregation is an impediment to equal opportunity." I.C. § 22-9-1-2(a).

[6] Before the hearing began a question arose as to whether a quorum required five or seven Commission members. Company's lawyer commented, "[M]y reading of your ordinance indicates you only need five commissioners for this hearing." Appellant's App. at 102.

11

The flaw in Company's argument is that it is not the alleged violation of a city ordinance that is at stake. Rather, it is the alleged violation of the Indiana Civil Rights Act. The ordinance merely provides authority for a local unit of government to "effectuate within its territorial jurisdiction" the civil rights laws of this state. Indeed by the express terms of the statute a local ordinance may not "conflict with any of the provisions" of the Act. I.C. § 22-9-1-12.1. We agree with the trial court's observation that "hearings before Human Rights Commissions are controlled by applicable case law as it relates to proving racial discrimination claims in a court of law. Human Rights Commissions have no authority to change or alter the standards to prove racial discrimination or the burden of proof that has been established by state and federal case law and statutes." Appellant's App. at 17. In essence, the fact that the Michigan City Ordinance was not introduced into evidence has no bearing on whether Company discharged Employees on the basis of race in violation the Indiana Civil Rights Act.

*Sufficiency of the evidence*

Company contends that Employees did not carry their burden of proving a prima facie case of unlawful discrimination. Specifically, pointing to the fourth element of the McDonnell Douglas burden-shifting framework, Company argues Employees failed to prove that it "treated similarly situated non-protected employees more favorably than they were treated." Appellant's Br. at 21.

As discussed earlier in this opinion, by establishing a prima facie case, the plaintiff creates a rebuttable "presumption that the employer unlawfully discriminated against" her. Burdine, 450 U.S. at 254; see McDonnell Douglas, 411 U.S. at 802. To rebut this presumption, the defendant must clearly set forth, through the introduction of admissible evidence, a legitimate nondiscriminatory reason for its actions. Burdine, 450 U.S. at 254. However, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). "At this stage, the McDonnell-Burdine presumption 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Id. (quoting Burdine, 450 U.S. at 255 & n.10). In turn, the "factual inquiry" is "whether the defendant intentionally discriminated against the plaintiff . . . . In other words, is

the employer treating some people less favorably than others because of their race, color, religion, sex, or national origin." Id. (internal quotations and alteration omitted) (noting that "[b]ecause this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether [plaintiff] made out a prima facie case. We think by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination vel non." Id. at 713-14); see also Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (declaring, "[T]he three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment context. Once there has been 'a full trial on the merits, the sequential analytical model adopted from McDonnell Douglas . . . drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against' the plaintiff because of his or her protected status").

Because this case proceeded to a full hearing on the merits, the question of whether Employees proved a prima facie case of unlawful discrimination is no longer relevant. Rather, the question is whether Company discharged Employees on the basis of race.

Company insists that race had nothing to do with its discharge of Employees. Instead, according to Company, Employees were discharged because they committed time-card fraud – a violation of Company's rules. But Employees counter they committed no such violation, implicitly arguing that Company's stated reason for discharge is unworthy of belief.

Employees' argument closely tracks the single-motive theory of unlawful employment discrimination, namely: the defendant's proffered reason is not true, but is instead a pretext for discrimination.[7] Untruthfulness may be demonstrated through evidence showing: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the adverse employment action or (3) that the proffered reason was insufficient to motivate the adverse employment action. Weihaupt v. Am. Med. Ass'n, 874 F.2d 419, 428 (7th Cir. 1989);

---

[7] The Commission not only made a specific finding of "pretext" but also, in the language of the mixed-motive theory, found that race was a "motivating factor" in Company's decision to discharge Employees. We conclude that because Employees carried the more difficult burden of proving pretext, they necessarily proved that race was a motivating factor in the Company's discharge decision. In essence, whether analyzed as a single-motive or mixed-motive case, Employees have carried their ultimate burden of proving unlawful discrimination.

see also Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1333 (7th Cir. 1994) (An employee may establish pretext by proving one of the following: "(1) Defendant's explanation . . . ha[s] no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the discharge.").

There is no question that Company's proffered reason was sufficient to justify terminating Employees. Company's employee handbook is clear on this point: time-clock fraud "will carry the penalty of immediate suspension and/or discharge." Appellant's App. at 154 (emphasis in original). And although no one testified to actually observing Employees engage in any such fraud, there was at least some basis in fact, albeit conflicting, that fraud may have occurred: the records showed they clocked-in on the same time clock at 7:01 a.m. under circumstances suggesting it was unlikely they could have done so separately. But the heart of the matter is whether the alleged time-clock fraud was the real reason actually motivating Company to discharge Employees. Apparently the Commission did not think so: "It is clear from the evidence in this matter that the stated reasons by the company for termination were pretextual and it was in fact the Claimant's race which was the motivating factor behind their discharge." Appellant's App at 13. This is supported by Commission's observation of "the lack of eyewitnesses to the alleged incident, the fact that the time clock records reflected other employees punching in at the same time on occasion and the lack of discipline for those employees," id. at 12, and the Commission's apparent skepticism of Wirtz's account of the incident and her investigation, id. at 10.

In addition, the Commission noted the disparity in the disciplinary action taken against Brooks and Weathers, as compared to other employees who engaged in equally or even more egregious conduct. When asked, "In fact, some individuals with some longstanding time with the Company that we've talked about were allowed to go one, two and three occurrences on terminable offenses and, yet, others, such as [Employees], were discharged immediately; isn't that right?" Forbes responded, "That is correct." Id. at 129. Indeed the record supports Forbes' testimony. For example: J.M. was a felt line worker who received a written warning on which Forbes "signed off" for making "discriminatory," "racial remarks" to an African-American employee. Id. at 125. In response to the question, "And you can't tolerate discriminatory or harassing comments made by any employee to another, can you?" Forbes testified, "That is

14

correct." Id. He acknowledged, however, that J.M. received no more than a written warning for making racially inflammatory remarks to a fellow employee. Company employee J.S., a production worker, received a verbal warning from Wirtz and Forbes for walking off the job, id. at 165, and a written warning for a separate incident involving "substandard," "very poor quality" work, id. at 166. And for company employee R.H., rather than impose any sanction or warning, Wirtz assigned him to another department after his "use of racial epithets" toward an African-American employee.[8] Id. at 128.

"[T]he question facing triers of fact in discrimination cases is both sensitive and difficult" and "there will seldom be 'eyewitness' testimony as to the employer's mental processes." Reeves, 530 U.S. at 141 (quoting Aikens, 460 U.S. at 716). Such is the case here. There is no smoking gun. However "[p]roof that the defendant's explanation is unworthy of credence [i.e., pretextual] is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147. In the end this is a call to be made by the fact finder – here the Commission. As with the trial court, this Court's review of the Commission's decision "is limited to consideration of (1) whether there is substantial evidence to support the agency's finding and order and (2) whether the action constitutes an abuse of discretion, is arbitrary, capricious, or in excess of statutory authority." Alder, 714 N.E.2d at 636 (Ind. 1999). We give deference to the expertise of the agency and will not reverse simply because we may have reached a different result than the Commission. Id. Because we agree there was substantial evidence to support the Commission's conclusion that Employees suffered unlawful employment discrimination, we conclude the trial court correctly affirmed the Commission's decision. On this point we affirm the judgment of the trial court.

---

[8] Company's employee handbook provides, "Conduct of the nature described in this section may carry a penalty of immediate suspension and/or discharge. The examples set forth in this section are not intended to be all-inclusive. They are to be representative of the type of behavior that *will warrant* immediate suspension with the intent to terminate employment, (pending investigation) . . . E. Leaving the job without permission . . . M. Vulgar and abusive language towards a supervisor or other employee." Appellant's App. at 203, 204 (emphasis added).

*Award of damages*

Company complains that the Commission's award of backpay as adjusted by the trial court is contrary to law, unsupported by substantial evidence and is arbitrary and capricious. Appellant's Br. at 39. The facts are these. At the hearing before the Commission Weathers' testimony and related exhibits revealed that for the relevant time period Weathers would have earned $12,090.00 in wages from Company. During the same time period she earned $6,954.00 from subsequent employment. Appellant's App. at 81. The Commission acknowledged "a difference of $5,136.00 between the two jobs." Id. at 12. However in awarding damages in Weathers' favor, the Commission declared that she "is entitled to damages in the form of lost wages and fringe benefits in the amount of $12,090.00." Id. at 13. As for Brooks, her testimony along with exhibits introduced into evidence at the hearing revealed that for the relevant time period she would have earned $39,312.00 in wages from Company. During the same time period, Brooks earned $17,154.31 from subsequent employment. For damages the Commission awarded Brooks the difference of $22,157.69. The Commission entered the following relevant findings:

> As evidenced by Plaintiff's Exhibit G, Ms. Weathers' suffered a loss of income after her termination from Filter Specialists from the period of time of January through July 31, 2004. At the time of her termination, Ms. Weathers was making $9.75 per hour and working approximately 40 hours per week. She grossed $6,954.00 while employed at Walgreens for seven months, leaving a difference of $5,136.00 between the two jobs. This comes to $12,090.00 that Ms. Weathers would have grossed during said period, or approximately $733.00 per month from January through July. (Plaintiff's Exhibit G).
>
> Ms. Brooks also incurred a loss of income as a result of her termination from employment. As evidenced by Plaintiff's Exhibit N to the trial transcript. As a result of her termination, Ms. Brooks sustained an income loss of $22,157.69. (Plaintiff's Exhibit N).

Appellant's App. at 12.

On review Company complained about the award of damages. In response, the trial court entered the following order:

> [T]his matter is remanded to the Michigan City Human Rights Commission to make appropriate findings of facts and conclusions as it relates to the damages suffered by each of the Respondents herein. Those findings should detail how those damages are arrived at by the Michigan City Human Rights Commission and should further *take into consideration any unemployment compensation benefits that may have been received by each of the Respondents*.

Appellant's App. at 18 (emphasis added). For reasons not apparent from the record before us, the Commission did not make any additional findings concerning its damages award. Instead, Counsel acting on behalf of Commission and Counsel acting on behalf of Employees filed a "Joint Request for Entry of Judgment." Appellant's App. at 69. The Request declared, among other things "[t]hat calculations of lost wages and benefits for both Charmaine Weathers and Dawn Brooks was correct in every respect . . . however said award failed to subtract or deduct amounts received by each Respondent for unemployment compensation." Id. Relying on exhibits introduced by Company demonstrating Brooks and Weathers received $4,687.90 and $6,477.00 respectively in unemployment benefits, Commission and Employees sought reduction of Brooks' award of $22,157.69 to $17, 469.79 and Weathers' award of $12,090.00 to $5,613.00. The trial court entered judgment accordingly.[9]

Company argues that as a matter of arithmetic Weathers is entitled to no backpay at all. This argument is based on the premise that as initial matter, Weathers was only entitled to $5,136.00 – the difference between the wages she would have received from Company and the wages she actually received from subsequent employment – and from that amount $6,477.00 Weathers received in unemployment benefits must be deducted. As for Brooks, Company challenges conflicting evidence concerning overtime pay and pay Brooks received for maternity leave. Based on its own calculations, Company contends Brooks is entitled to $5,965.29 in lost wages.

---

[9] Company contends "[i]t was appropriate to reduce the back pay award by the amount of unemployment compensation received by each Employee, but it was improper for the attorneys representing the Employees and the Commission to usurp the Commission's responsibility to make supplemental findings of fact and conclusions as directed by [the trial court]." Appellant's Br. at 42 n.4. Although Company raises this issue as error, it makes no further argument in this regard; nor does it seek any particular relief. Except as otherwise discussed infra, we decline to address this issue further.

We first observe that a majority of federal circuit courts that have considered the matter has determined that unemployment benefits should not be deducted from backpay awards in discrimination cases. Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1113-14 (8th Cir. 1994) (citing cases). However, circuits are split over whether deducting unemployment benefits should be left to the discretion of the trial court. Id. Although recognizing contrary authority on the question of discretion, the Court of Appeals has adopted the majority view for cases arising under the Indiana Civil Rights Act. Indiana Civil Rights Comm'n v. Weingart, Inc., 588 N.E.2d 1288, 1291 (Ind. Ct. App. 1992) (finding trial court error "in reducing the back pay award by the amount of unemployment compensation"). Acknowledging concerns that failure to deduct such compensation may lead to double recovery, the court noted that a claimant must repay the state for unemployment compensation received for the period that the award covers. Id. We believe the majority rule is the more sound position and thus agree with the Court of Appeals on this point.

In this case the Commission did not deduct from Employees backpay the amount Employees received in unemployment compensation benefits. This was correct. In contrast the trial court erred by ordering this cause remanded to the Commission with instructions to "take into consideration any unemployment benefits that may have been received by each of the Respondents," Appellant's App. at 18, and then entering judgment reflecting deductions in unemployment benefits. In sum the damages awarded to Employees should not have been affected by their receipt of unemployment compensation.

Although neither party specifically addresses the issue in its briefs, we examine the appropriate measure of damages in this case. Where a party has suffered unlawful discrimination, a local Human Rights Commission may "order payment of actual damages, except that damages to be paid as a result of discriminatory practices relating to employment shall be limited to lost wages, salaries, commissions, or fringe benefits." I.C. § 22-9-1-12.1(c)(8). For our purposes "lost wages" are synonymous with "backpay."[10] Backpay awards

---

[10] For victims of job discrimination arising under Title VII, lost wages may include "backpay" as well as what is commonly referred to as "front pay." Front pay awards are made in lieu of reinstatement, Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 853 (2001), and are based on reasonably anticipated future lost wages caused by unlawful discrimination. Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992); see also Kucia v. Se. Ark. Cmty. Action Corp., 284 F.3d 944, 948 (8th Cir. 2002) ("Front pay

in discrimination cases serve two functions: they make victimized employees whole for the injuries suffered as a result of the past discrimination, and they deter future discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975).

Damages in the form of backpay are calculated from the date of discharge to the date of the decision. Daniel v. Loveridge, 32 F.3d 1472, 1477 (10th Cir. 1994). The amount of damages is determined by measuring the "difference between plaintiff's actual earnings for the period and those which [s]he would have earned absent the discrimination of defendants." Waters v. Wis. Steel Works of Int'l Harvester Co., 502 F.2d 1309, 1321 (7th Cir. 1974); see also 42 U.S.C. § 2000e-5(g) (providing that backpay is reduced by "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against").

In this case the record supports the Commission's findings that Brooks is entitled to backpay of $22,157.69. Calculated from the date of discharge on March 5, 2003, to the date of the hearing on April 20, 2005, this amount represents the difference between what Brooks would have earned absent Company's unlawful discrimination and the amount of her actual earnings from subsequent employment. Company's argument to the contrary is merely a request that we reweigh the evidence, which we decline to do.

On the other hand, the record does not support the Commission's findings that Weathers is entitled to backpay of $12,090.00. Nor, for reasons we have discussed, does it support the trial court's judgment awarding damages in the amount of $5,613.00. Rather the record shows that the difference between Weathers' actual earnings and those she would have earned absent Company's unlawful discrimination totals $5,136.00.[11]

_____

is an equitable remedy 'given in situations where reinstatement is impracticable or impossible.'") (internal citation omitted); EEOC v. W&O, Inc., 213 F.3d 600, 619 (11th Cir. 2000) ("We hold that front pay retains its equitable nature under Title VII after passage of the Civil Rights Act of 1991"). The Indiana Civil Rights Act and Title VII differ in this regard. That is to say, equitable relief in the form of reinstatement is not an available remedy; and in consequence neither is front pay.

[11] Rather than calculating damages from the date of discharge to the date of the hearing, Weathers introduced exhibits and provided testimony supporting an award of lost wages from January 2004 through July 2004. Appellant's App. at 155. A plaintiff in a discrimination case has the burden of establishing "what he or she contends to be the damages resulting from the discriminatory acts of the employer." Nord v. U.S. Steel Corp., 758 F.2d 1462, 1470 (11th Cir. 1985). The full transcript of the proceeding in front of the Commission is not before us. As a consequence we have inadequate information to fully

**Conclusion**

We conclude there was substantial evidence to support the Commission's findings that Employees were discharged from employment because of race, and that Commission's findings in this regard were not an abuse of discretion, arbitrary, capricious, or in excess of statutory authority. We therefore affirm the judgment of the trial court on this issue.

As for the award of damages, there was also substantial evidence to support the Commission's findings that Brooks was entitled to an award of backpay in the amount of $22,157.69. By reducing the award to $17,469.79 the trial court erred. And although there was no evidence to support the Commission's findings that Weathers was entitled to an award of backpay in the amount of $12,090.00, the trial court also erred by reducing the award to $5,613.00. We therefore reverse the trial court on this issue and remand with instructions to enter awards of damages for Employees consistent with this opinion.

The judgment of the trial court is affirmed in part and reversed in part. This cause is remanded for further proceedings.

Dickson, Sullivan and Boehm, JJ., concur.
Shepard, C.J., not participating.

---

evaluate the underlying rationale for Weathers' damage claim. However, we note that throughout the proceedings Weathers and Brooks were represented by the same attorney. We thus presume that Weathers' decision concerning her claim of damages was the result of a deliberate and conscious decision.