Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not
be regarded as precedent or cited
before any court except for the purpose
of establishing the defense of res
judicata, collateral estoppel, or the law
of the case.



FILED

Mar 14 2013, 8:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**EDWARD J. MERCHANT**
Ruckelshaus Kautzman Blackwell
  Bemis & Hasbrook
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**CHARLES N. BRAUN II**
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RICHARD LINDSEY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 83A05-1206-MI-317 |
| | ) | |
| CITY OF CLINTON, INDIANA, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE VERMILLION CIRCUIT COURT
The Honorable David A. Ault, Special Judge
Cause No. 83C01-1108-MI-12

**March 14, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Richard Lindsey appeals the trial court's order affirming the decision of the Police Department Merit Board for the City of Clinton (the "Merit Board") to terminate his employment as a police officer. Lindsey raises one issue, which we restate as whether the court's decision was unsupported by substantial evidence or was arbitrary and capricious. We affirm.

## FACTS & PROCEDURAL HISTORY

Lindsey was a police officer with the City of Clinton Police Department (the "Department"). In October 2009, Police Chief Curtis Stoffel was informed that Lindsey had been observed several times operating a motorcycle. On October 19, 2009, Chief Stoffel met with Lindsey and discussed the issue, at which time Lindsey informed Chief Stoffel that he possessed a motorcycle learner's permit. Chief Stoffel advised Lindsey to follow the guidelines of the motorcycle learner's permit. At the time, the records of the Indiana Bureau of Motor Vehicles disclosed that Lindsey did not have a motorcycle learner's permit.

On February 28, 2010, Lindsey and K.J., who were involved in an intimate relationship, went on a trip to Florida. On or about March 5, 2010, Lindsey and K.J. stayed at a hotel in the area of Key West, Florida, where at some point Lindsey caused K.J. to fall onto the floor of their hotel room, and Lindsey did not seek or provide K.J. with medical assistance. After returning to Indiana on March 9, 2010, K.J. sought medical attention for injuries and made a verbal complaint against Lindsey with Chief Stoffel. On or about March 12, 2010, Chief Stoffel informed Lindsey of the verbal complaint and ordered Lindsey not to have any further contact with K.J. during the

2

Department's internal investigation. Assistant Chief Daniel Whallon interviewed Lindsey on March 17, 2010, in connection with the Department's internal investigation and summarized his findings in a report dated March 31, 2010.

On about April 1, 2010, Lindsey's take-home police vehicle was observed parked directly in front of K.J.'s residence, and Lindsey was again advised to have no further contact with K.J. during the internal investigation.

On April 11, 2010, Lindsey was observed operating his motorcycle while not wearing a helmet. On April 22, 2010, Lindsey was observed operating his motorcycle, not wearing a helmet, and carrying K.J., who was also not wearing a helmet, as a passenger. On June 17, 2010, Lindsey was again observed operating his motorcycle while not wearing a helmet and carrying his daughter as a passenger. On the dates of April 11, April 22, and June 17, 2010, Lindsey possessed a valid motorcycle learner's permit but not a motorcycle license.

An officer evaluation report dated May 4, 2010, prepared by Assistant Chief Whallon included a comment that Lindsey "was given orders from [Chief Stoffel] to have no contact with a female subject during an internal investigation. Officer disobeyed this order." Id. at 22. On a scale of 1 to 5, with 1 being poor and 5 being excellent, the report indicated a "2" for "general attitude" and a "3" for "moral" and for "judgment." Id. at 21. Lindsey received a "5" for his knowledge of traffic laws and a "4" for each of the other categories. Id.

Also on May 4, 2010, Lindsey visited with K.J. at her residence and left his personal vehicle unlocked and parked in front of her residence. Lindsey discovered that a

3

set of keys which included a key to the Department and Lindsey's patrol car and other patrol cars had been stolen, and Lindsey contacted the Vermillion County Sheriff's Department and reported the theft of the keys. Later that day, Lindsey left a handwritten note for Chief Stoffel stating: "POV. was broke into last night around 3 am. Only thing taken were my CPD keys & my house keys. 83-3 took the report." Id. at 29.

On May 5, 2010, Chief Stoffel sent a memorandum to all officers indicating that sometime on May 4, 2010, Lindsey had his keys to the police vehicles and the Department stolen out of his personal vehicle, providing instructions regarding securing and parking vehicles, and informing "every person with keys to this department and/or vehicles to never leave them unsecured in your vehicle." Id. at 27. On May 10, 2010, Chief Stoffel requested a full investigation regarding the theft reported by Lindsey on May 4, 2010.

On May 13, 2010, Chief Stoffel hand delivered a memorandum letter to Lindsey which advised him he "ha[d] been, and continue[d] to be, under department internal affairs investigation for various disciplinary related violations" and that the investigations "relate[d] to [Lindsey's] conduct both on duty as an officer for [the Department] and off duty as well." Id. at 23. In the memorandum letter, Chief Stoffel stated that he was preparing to file formal disciplinary charges with the Merit Board recommending that Lindsey's employment be terminated and provided Lindsey with "an opportunity to voluntarily resign from the [Department] in lieu of facing the filing of the various disciplinary charges." Id. Chief Stoffel stated that "[a]t this time I am not required to share with you what the anticipated charges will be, or the underlying facts, if you decide

4

not to voluntarily resign," that "[t]hese of course will be provided to you in great detail if I am required to initiate the formal disciplinary charging process in the future," and that "[i]n addition, I am not required to tell you when the anticipated charges will be filed with the Merit Board." Id. Chief Stoffel further stated that Lindsey was not required to resign, that he was entitled to seek out counsel and was "highly encouraged" to seek counsel and to discuss the matter with family, colleagues, advisors, and friends before making any final decision. Id. The memorandum letter also provided that "[e]ffective immediately and until further notice by me, your job assignment will be working at the [Department] Headquarters, specifically performing night radio dispatch duties and your new shift time will be between the hours of 6:00 P.M. to 6:00 A.M.," that "[f]or your new duties you will not need to be in uniform or be in possession of your department issue[d] weapons/equipment since your duties will not involve exercising police authority on the street until further notice by me," and that "[y]our present police rank, grade, salary or benefits will not be affected in any way by this assignment." Id. at 24.

Chief Stoffel filed charges, dated May 12, 2011, against Lindsey with the Merit Board which included seven counts for breach of discipline. Count I alleged that Lindsey ended his work shift early without authorization on December 4, 2010, and failed to notify his supervisor that he would not be at his assigned shift on December 5, 2010. Count II alleged that on April 11, 2010, at approximately 6:45 p.m. Lindsey was observed operating his motorcycle and not wearing a helmet; that on April 22, 2010, Lindsey and K.J. were observed riding on Lindsey's motorcycle and neither were wearing a helmet; that on June 17, 2010, at 5:41 p.m. Lindsey was again riding his

5

motorcycle without wearing a helmet and that he had a small female child on the rear of the bike; and that Lindsey was not complying with Indiana traffic laws and a direct verbal order given to him on October 19, 2009, by Chief Stoffel to obtain a motorcycle license or permit and obey all traffic laws. Count III alleged that on or about April 14 and April 18, 2010, Lindsey observed a group of juveniles engaged in fighting in a park and took no action to stop the fight or notify the parents of the persons involved in the fight. Count IV alleged that on or about March 5, 2010, Lindsey and K.J., while staying in Key West, Florida, began to argue, that the argument became physical in nature, that Lindsey inflicted pain on K.J., eventually knocking her unconscious, and that Lindsey did not provide K.J. first aid or take her to a medical facility. Count V alleged that, in connection with an internal investigation related to the events described in Count IV, Lindsey was ordered not to have further contact with K.J., that on April 1, 2010, Lindsey's take-home police vehicle was seen parked on the street in front of K.J.'s residence, that Lindsey had been ordered twice not to have contact with K.J. during the internal investigation, and that on April 22, 2010, Lindsey was observed operating his motorcycle with K.J. as a passenger. Count VI alleged that Lindsey's Department-issued keys had been stolen from his unlocked personal vehicle, that Chief Stoffel requested a full investigation into the theft of the keys, and that the Vermillion County Sheriff's Office advised that Lindsey had refused to complete a statement or cooperate any further with the investigation. Count VII alleged that Lindsey was ordered to remove his personal items from his squad car and return the vehicle the following day and that the following day Lindsey returned the vehicle with most of his personal belongings still in the vehicle.

6

On July 13 and 14, 2011, the Merit Board held a hearing at which it heard testimony and arguments related to the allegations against Lindsey. The parties presented evidence and testimony which included testimony from Chief Stoffel, Assistant Chief Whallon, Lindsey, the Clerk/Treasurer for the City, and a number of police officers, as well as documentary evidence including selected timesheets for Lindsey, Lindsey's BMV records, a case report from the Vermillion County Sheriff's Department, Lindsey's officer evaluation report, internal Department correspondence regarding Lindsey and his conduct, and a number of witness statements.

Lindsey testified, with respect to the incident where K.J. was knocked off of a bed in a hotel room during their Florida trip, that he rolled off of K.J., believed she "could pounce on [him]," and "proceeded to give her a playful kick" and "connected with her and she went off the end of the bed and struck the floor." Merit Board Transcript at 264-265. Lindsey testified that K.J. "didn't pop back up like [he] thought she would," that he "crawled down to the foot of the bed and looked over the edge to check on her," that "[s]he was laying there looking straight up at the ceiling, breathing," that he said "[w]hat's the matter," and "she didn't respond." Id. at 265-266. Lindsey further testified that he "swung around and got off the bed and she was laying there breathing and she was starting to get up" and he "was over there putting some clothes away and when she got up she was upset, she was crying and she was extremely mad." Id. at 266. Lindsey testified that he did not think K.J. was injured. Lindsey further testified that K.J. was crying and "started yelling at [him] about how she was going to get [him] fired" and that he "asked her '[w]hy she was so mad,' and that was the first that I heard anything about

7

being knocked unconscious." Id. at 269-270. When asked whether it was possible that K.J. did not respond at first because she was unconscious, Lindsey testified "I don't know, I'm not a medical doctor. Like I said, she was breathing. She was looking up. I just thought she was exhausted from our foreplay." Id. at 270. Lindsey indicated that he did not provide medical assistance or make any calls for medical services. Testimony was presented that, after returning to Indiana, K.J. sought medical attention at a hospital in Indiana in connection with the altercation with Lindsey.

In addition, when asked "[w]as there a conversation with [Assistant Chief] Whallon [on May 4, 2010] regarding perhaps you feel you were being harassed by the department," Lindsey answered "yes" and explained that "I didn't agree with one of [Assistant Chief Whallon's] evaluation points," that "[t]he remarks that he penned on the paper about me having contact with [K.J.] . . . I felt that that was harassment," and that "it was an illegal order. That only a judge can issue a no contact order." Id. at 372. Lindsey further testified: "I further stated that I had inquired or was going to inquire with legal counsel about a possible harassment against the department." Id. at 372-373. When asked about his actions in the days following, Lindsey testified that he "contacted the EEOC with a telephone number" and "the Indiana Civil Liberties and gave them [his] story." Id. at 373. Further, the Clerk/Treasurer for the City indicated that Lindsey had visited her office around April 2010 and asked "whether there existed any policies regarding harassment in the City" and the Clerk/Treasurer printed off some information and gave it to him. Id. at 437.

8

Following the hearing, the Merit Board took the matter under advisement. On July 27, 2011, the Merit Board held an executive session to deliberate regarding the disciplinary charges. On July 29, 2011, the Merit Board issued Findings of Fact and Conclusions of Law, which stated that Count VII had been withdrawn at the request of the Department, that the Merit Board reached a vote of 2-2 upon the charges under Count I resulting in a decision in favor of Lindsey on that count, that the Department met its burden of proof as to the charges under Counts II, IV, V, and VI, and that the Department failed to meet its burden of proof as to the charges under Count III. Specifically, the Merit Board determined, as to Count II, that Lindsey's operation of his motorcycle on April 11, April 22, and June 17, 2010, while not wearing a helmet and possessing only a motorcycle learner's permit was a violation of Ind. Code § 9-24-8-3(b)(1), that carrying a passenger on his motorcycle on April 22 and June 17, 2010, while possessing only a motorcycle learner's permit was a violation of Ind. Code § 9-24-8-3(b)(3), that Lindsey's operation of his motorcycle on the three dates was a violation of Chief Stoffel's order on October 19, 2009, and that Lindsey's conduct on the three dates constituted conduct unbecoming an officer. As to Count IV, the Merit Board determined that Lindsey's "conduct in striking or pushing [K.J.] off the bed and onto the floor of their hotel room, rendering her unconscious and/or incapacitated, and in further failing to provide or obtain medical care for [K.J.] as a result of this incident constitutes conduct unbecoming an officer." Id. at 18. As to Count V, the Merit Board found that Lindsey's continued contact with K.J. following her verbal complaint to Chief Stoffel and the initiation of an internal investigation, and in light of the direct verbal orders of Chief Stoffel and

9

Assistant Chief Whallon not to have contact with K.J., constituted conduct unbecoming an officer. As to Count VI, the Merit Board found that Lindsey's failure to properly secure the keys of the Department and its patrol vehicles by leaving them in his unlocked personal vehicle constituted neglect of duty and neglect of orders and that Lindsey's failure to secure the keys and his further conduct in reporting the theft to a different police agency and only informing Chief Stoffel of the theft by leaving a note constituted conduct unbecoming an officer. Based upon its decision as to Counts II, IV, V, and VI, the Merit Board determined that Lindsey's employment with the Department was to be terminated as of July 29, 2011.

Lindsey filed a petition for judicial review of the Merit Board's decision, and the trial court held a hearing on March 9, 2012. On May 22, 2012, the trial court issued Findings of Fact, Conclusions of Law and Order affirming the determination of the Merit Board. The court specifically found that sufficient evidence was presented on Counts II, IV, V, and VI to support the Merit Board's determinations and that the Merit Board "adhered to all proper legal procedures as required by Indiana Code § 36-8-3.5-17 and did not act in a retaliatory manner in finding that Lindsey should be terminated." March 22, 2012 Order of the Trial Court at 11. The court found that Lindsey failed to establish that the Merit Board's decision was arbitrary or capricious or contrary to law.

ISSUE & STANDARD OF REVIEW

The issue is whether the trial court's decision was arbitrary and capricious or unsupported by substantial evidence. In reviewing the decision of an administrative agency, we defer to the agency's expertise and will not reverse simply because we may

10

have reached a different result. <u>Filter Specialists, Inc. v. Brooks</u>, 906 N.E.2d 835, 844 (Ind. 2009). To that end, we may consider only whether the decision was based on substantial evidence, was arbitrary and capricious, or was in violation of any constitutional, statutory, or legal principle. <u>Id.</u> "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Ind. Family and Soc. Servs. Admin. v. Pickett</u>, 903 N.E.2d 171, 177 (Ind. Ct. App. 2009), <u>aff'd</u> <u>and</u> <u>clarified</u> <u>on</u> <u>reh'g</u>. The challenging party has the burden of proving that an administrative action was arbitrary and capricious. <u>Fornelli v. City of Knox</u>, 902 N.E.2d 889, 892 (Ind. Ct. App. 2009) (citation omitted), <u>trans.</u> <u>denied</u>. An arbitrary and capricious decision is one that is patently unreasonable, made without consideration of the facts and in total disregard of the circumstances, and lacks any basis that might lead a reasonable person to the same conclusion. <u>Id.</u> We may not substitute our judgment for that of the administrative body. <u>Davidson v. City of Elkhart</u>, 696 N.E.2d 58, 61 (Ind. Ct. App. 1998), <u>trans.</u> <u>denied</u>. On review, we do not reweigh the evidence. <u>Id.</u>

"Moreover, the discipline of police officers is within the province of the government's executive, rather than judicial, branch." <u>Fornelli</u>, 902 N.E.2d at 893 (internal quotation marks and citations omitted). "For this reason, we will not substitute our judgment for that of the administrative body when no compelling circumstances are present." <u>Id.</u>

## DISCUSSION

Lindsey contends that (A) the disciplinary charges filed against him were motivated by retaliation; (B) the doctrine of laches barred the charges against him; and

11

(C) the findings and conclusions concerning all counts were unsupported by substantial evidence and were thus arbitrary and capricious.

A. Retaliation

Lindsey asserts that the fact that Chief Stoffel allegedly articulated a lawful reason for the termination of Lindsey's employment which appears to be independent does not necessarily establish that Chief Stoffel lacked retaliatory intent when he filed disciplinary charges against Lindsey, that Chief Stoffel's reasons for recommending the termination of Lindsey were all pretextual because they were clearly stale, and that the evidence makes it apparent that Chief Stoffel retaliated against Lindsey because Lindsey threatened to file a complaint with the EEOC and/or ICLU and because Lindsey had advised Assistant Chief Whallon that he was going to discuss the harassment matter with his attorney. Lindsey argues that, nine days after advising Assistant Chief Whallon of his intention to file a harassment complaint, Lindsey received a memorandum from Chief Stoffel requesting his resignation but not advising him as to the reasons for the request.

The City maintains that the disciplinary charges filed against Lindsey were not motivated by retaliation. The City argues that, "[o]ther than the extremely vague assertions" that Lindsey "verbally mentioned briefly one time" to Assistant Chief Whallon that he felt he was being harassed and that he contacted the EEOC and ICLU, the record does not show that Lindsey notified the City, Department, or Merit Board that he was going to contact or had contacted either the EEOC or ICLU and that the transcript of the Merit Board hearing is "devoid of any concrete evidence to support Lindsey's assertion that he was being harassed before the filing of the disciplinary charges against

12

him . . . ." Appellee's Brief at 3. The City argues that the record lacks any evidence that Lindsey "did anything formally to assert his vague harassment claim." Id. at 3-4. The City further asserts that there is no evidence "which exhibits a long standing deep seated 'bad blood' with any of the City Officials involved" or that "the City was getting even with Lindsey because he was 'thinking about' pursuing a harassment claim." Id. at 5. In his reply brief, Lindsey argues that the evidence makes clear that Chief Stoffel's actions were motivated by retaliation and that there was no reasonable explanation as to why Chief Stoffel waited a year to file the disciplinary charges he claimed to be presently preparing on May 13, 2010.

At the hearing before the Merit Board, when asked "[w]as there a conversation with [Assistant Chief] Whallon [on May 4, 2010] regarding perhaps you feel you were being harassed by the department," Lindsey answered "yes" and explained that "I didn't agree with one of [Assistant Chief Whallon's] evaluation points. The remarks that he penned on the paper about me having contact with [K.J.]," that "I felt that that was harassment," and that "it was an illegal order. That only a judge can issue a no contact order." Merit Board Transcript at 372. Lindsey further testified: "I further stated that I had inquired or was going to inquire with legal counsel about a possible harassment against the department." Id. at 372-373. When asked about his actions in the days following the conversation on May 4, 2010, Lindsey testified that he "contacted the EEOC with a telephone number" and "the Indiana Civil Liberties and gave them [his] story." Id. at 373. Also, the Clerk/Treasurer for the City indicated that Lindsey had visited her office in approximately April 2010 and asked for any policies regarding

13

harassment in the City. The trial court found that the Merit Board "adhered to all proper legal procedures as required by Indiana Code § 36-8-3.5-17[1] and did not act in a retaliatory manner in finding that Lindsey should be terminated." March 22, 2012 Order of the Trial Court at 11.

We observe that Lindsey does not point to the record to show that he informed the Department that he intended to raise any harassment or other allegations prior to the dates Chief Stoffel informed him in October 2009 to follow the traffic laws or of the March 2010 verbal complaint by K.J. or prior to his May 4, 2010 meeting with Assistant Chief Whallon.

With respect to Lindsey's argument that the timing of Chief Stoffel's May 13, 2010 letter relative to Lindsey's May 4, 2010 meeting with Assistant Chief Whallon shows retaliatory intent, we note that the record shows that Chief Stoffel informed Lindsey in October 2009 to follow the traffic laws, that Chief Stoffel informed Lindsey on or about March 12, 2010, of the verbal complaint against him by K.J. and ordered Lindsey not to have any further contact with K.J. during the internal investigation, that Lindsey was interviewed sometime in March 2010 as part of the internal investigation, and that Lindsey visited K.J.'s residence on April 1, 2010 and carried K.J. as a passenger on April 22, 2010. Each of these incidents occurred prior to Lindsey's May 4, 2010 meeting with Assistant Chief Whallon. Further, the March 31, 2010 report detailed the findings of the investigation regarding Lindsey's trip to Florida and altercations with K.J., and the May 4, 2010 evaluation stated that Lindsey had disobeyed the order to have

---

[1] Indiana Code § 36-8-3.5-17 governs disciplinary actions under police and fire merit systems.

no contact with K.J. Lindsey reported the stolen keys on May 4, 2010, and Chief Stoffel sent a memorandum to all officers regarding the matter on May 10, 2010. We observe that this timeline suggests that the timing of Chief Stoffel's May 13, 2010 letter was in response to the events of the preceding months.

Further, as to Lindsey's assertion that the fact that the May 13, 2010 letter did not advise him of the details of the internal investigation shows retaliatory intent, we note that Lindsey was specifically informed to follow the traffic laws, that K.J. had filed a complaint against him, and not to have contact with K.J. Also, Lindsey was interviewed by Assistant Chief Whallon regarding K.J.'s complaint, and the May 13, 2010 letter explained that Chief Stoffel was not required to share the anticipated charges until formal disciplinary charges were initiated.

Based upon the record and the evidence before the Merit Board, we cannot say that Lindsey has demonstrated or that the evidence shows that Chief Stoffel's May 13, 2010 letter was prepared, that the disciplinary charges against Lindsey were filed, or that Lindsey's employment was terminated in retaliation for Lindsey's statements to Assistant Chief Whallon that he felt he was being harassed or that he had or was going to make inquiry with legal counsel.

B. Laches

Lindsey next argues that the doctrine of laches operates to bar the disciplinary charges against him, that not one of the disciplinary charges involved conduct that occurred in calendar year 2011 although the charging document was filed on May 12, 2011, that Chief Stoffel advised Lindsey on May 13, 2010 that he was "presently

15

preparing" to file disciplinary charges, and that the unexplained length of time between the alleged misconduct and the filing of the charges caused both prejudice and injury to Lindsey. Appellant's Brief at 8.

The City argues that Lindsey does not cite to authority for his argument that the City's actions must be invalidated based upon the doctrine of laches. The City asserts that Chief Stoffel testified that the investigation of Lindsey uncovered new issues to investigate, that the transcript is devoid of any evidence that Lindsey suffered a reduction in salary or was suspended during the investigation phase or after the disciplinary charges were filed, and that Lindsey cannot show that his defense was prejudiced by any delay and "the memory of the witnesses is always a challenge for both sides and the trier of fact will always judge the credibility of each witness." Appellee's Brief at 13.

Laches is an equitable defense that may be raised to stop a person from asserting a claim that he would normally be entitled to assert. Ind. Real Estate Comm'n v. Ackman, 766 N.E.2d 1269, 1273 (Ind. Ct. App. 2002). The rationale behind the doctrine of laches is that a person who, for an unreasonable length of time, has neglected to assert a claim against another waives the right to assert his claim when this delay prejudices the person against whom he would assert it. Id. Laches requires: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth., 831 N.E.2d 725, 729 (Ind. 2005), cert. denied, 546 U.S. 1093, 126 S. Ct. 1051 (2006). The question of laches is one to be determined by the court in the exercise of its sound discretion. Ackman, 766

16

N.E.2d at 1273 (citation omitted). For a decision to be reversed on appeal, an abuse of discretion must be clearly demonstrated. Id.

The record reveals that Chief Stoffel's May 13, 2010 memorandum letter to Lindsey expressly informed Lindsey that he was under investigation for various disciplinary violations related to his on-duty and off-duty conduct and that Chief Stoffel was preparing to file formal disciplinary charges with the Merit Board recommending that Lindsey's employment be terminated. The letter encouraged Lindsey to seek counsel and discuss the matter with advisors and others. In addition, the memorandum letter expressly informed Lindsey that the anticipated charges and underlying facts would be provided to him in great detail if formal disciplinary charges were initiated. The letter also provided that Lindsey's job assignment was being altered and that his rank, grade, salary and benefits would not be affected. Moreover, the memorandum letter expressly informed Lindsey that "[i]n addition, I am not required to tell you when the anticipated charges will be filed with the Merit Board." Appellant's Appendix at 23. The language of the May 13, 2010 letter and Lindsey's job reassignment in connection with the internal investigation do not show that the Department or Chief Stoffel in some way acquiesced or impliedly waived filing the disciplinary charges.

Moreover, Lindsey was specifically informed to follow the traffic laws in October 2009 and that K.J. had filed a complaint against him and not to have contact with K.J. in March 2010, and he was interviewed by Assistant Chief Whallon regarding K.J.'s complaint in March 2010 and was aware that the Department's keys were stolen from his unsecured vehicle in May 2010. The subsequent charges against Lindsey provided

17

sufficient detail of the alleged breach of discipline allegations against him, and Lindsey was given an adequate opportunity to and did present evidence and testimony regarding the allegations at the Merit Board hearing.

Based upon the record, we cannot say that Lindsey has demonstrated that the length of time between the date he received a letter regarding the internal investigation in May 2010 and the date the charges were filed in May 2011 or the dates of the hearing before the Merit Board in July 2011 prevented Lindsey from presenting an adequate defense at the Merit Board hearing, that he was prejudiced by any delay under the circumstances and in light of the charges, or that equity dictates that the Department's charges be dismissed based upon the doctrine of laches.

C.    Findings and Conclusions

Lindsey contends that the trial court's findings and conclusions concerning all counts were unsupported by substantial evidence and were thus arbitrary and capricious. He argues in part with respect to Count II that, even assuming *arguendo* that he did operate his motorcycle without a helmet or carried passengers on his motorcycle while he possessed a learner's permit, the violations do not justify his termination as they do not bear any relationship to his fitness as an officer or upon his capacity to discharge his duties. Lindsey further claims that the facts and conclusions concerning Count IV were based upon a biased and corrupt internal investigation which tainted the Merit Board's entire determination. He asserts that Chief Stoffel informed Assistant Chief Whallon that "Lindsey 'battered' [K.J.] in Florida before providing Lindsey an opportunity to explain his side of the story!" Appellant's Brief at 13. Lindsey also argues that he never stated

18

that K.J. appeared unconscious or that her eyes rolled back in her head and that, in fact, he did not think K.J. was injured at the time the accident occurred. Lindsey points to his statements in a report summarizing his internal investigation interview which provided that he had stated that the incident "was just horseplay" and was "an accident" and that he had offered to call 911 or the local police "at least four times." Id. at 14 (citations omitted). With respect to Counts IV and V, Lindsey argues that the right to privacy prohibits the Department from disciplining Lindsey on the basis of off-duty personal or sexual relationships and that, even assuming *arguendo* that Chief Stoffel could issue the no contact order, no evidence was presented regarding how Lindsey's alleged violation negatively impacted his efficiency as an officer.

The City maintains that evidence was presented at the hearing before the Merit Board supporting the allegations under each of the counts against Lindsey. The City argues that Lindsey's private conduct was reasonably related to his ability to be a police officer. In his reply brief, Lindsey points out that he was not issued citations for the alleged traffic violations, that no written complaint was filed regarding K.J.'s complaint, that K.J. did not testify at the Merit Board hearing and thus there was no direct evidence concerning the contents of her alleged complaint, that Lindsey notified Chief Stoffel of the theft of the keys on the day they were stolen, and that the findings of the Merit Board and court were arbitrary and capricious and unsupported by substantial evidence.

The record reveals that Lindsey was observed on April 11, April 22, and June 17, 2010, riding his motorcycle without wearing a helmet. On these dates, Lindsey possessed a valid motorcycle learner's permit but not a motorcycle license. Ind. Code § 9-24-8-

19

3(b)(1) requires an operator of a motorcycle holding a motorcycle learner's permit to wear a helmet. Further, on April 22 and June 17, 2010, Lindsey was observed carrying a passenger on his motorcycle. Ind. Code § 9-24-8-3(b)(3) prohibits an operator of a motorcycle with a motorcycle learner's permit to carry other passengers. Moreover, on October 19, 2009, Chief Stoffel had expressly advised Lindsey to follow the guidelines of the motorcycle learner's permit.

The record further reveals that K.J. visited Chief Stoffel in person between March 9 and March 12, 2010, and made a verbal complaint regarding the conduct of Lindsey during a trip she had taken with Lindsey to Florida. Assistant Chief Whallon interviewed Lindsey on March 17, 2010, as a part of an internal investigation and prepared a report dated March 31, 2010. Lindsey's testimony before the Merit Board included a description of the incident where K.J. was knocked off of a bed in a hotel room and onto the floor. Lindsey specifically testified that he gave Lindsey "a playful kick," that K.J. "went off the end of the bed and struck the floor," that K.J. "didn't pop back up like [he] thought she would," that K.J. did not respond when he asked what was the matter, that when K.J. "got up" she was "upset . . . crying and she was extremely mad," that he asked why she was so mad and "that was the first that I heard anything about being knocked unconscious," and that he did not provide medical assistance or make any calls for medical services. Merit Board Transcript at 264-270.[2] Testimony was presented that,

---

[2] The March 31, 2010 report prepared by Assistant Chief Whallon in connection with K.J.'s complaint indicated in part that, at one point when Lindsey and K.J. were in a hotel room during their trip to Florida, K.J. "went to the foot of the bed," that Lindsey "was on his stomach across the bed" and "thought she was going to jump on him (playfully), so he raised his foot, and 'hit her with his foot.'" Appellant's Appendix at 34. The report provided that "[Lindsey] said, 'I called out to her . . . [K.J.]? But no answer'" and that Lindsey crawled to the edge of the bed and noticed her on the floor. Id. Lindsey

20

after returning to Indiana, K.J. sought medical attention at a hospital in Indiana in connection with what occurred in Florida.

Despite Chief Stoffel's order that Lindsey not have any contact with K.J. during the internal investigation, Lindsey's take-home police vehicle was observed parked directly in front of K.J.'s residence on about April 1, 2010, Lindsey was observed riding his motorcycle carrying K.J. as a passenger on June 17, 2010, and Lindsey parked his vehicle in front of K.J.'s residence for approximately twelve hours and visited with her on May 4, 2010.

The record also shows that, after he parked in front of K.J.'s residence on May 4, 2010, for approximately twelve hours, Lindsey discovered that keys to the Department

said that K.J. "was on her back, her eyes were opened, and she was breathing hard." Id. Lindsey reported that "he got out off [sic] bed and started to fold laundry and put it away" and that "a few seconds later [K.J.] rolled over and started crying." Id. The report indicated that "He told me she was mad, *she told him she had been knocked unconscious*." Id. (emphasis added). The report further indicated: "He said, 'I did not know you were unconscious'. He told her that they were just 'horsing around'. *She did not believe him* and they started arguing." Id. (emphasis added). The report further indicated that Lindsey "went on to tell me that it was just horseplay, and that it was an accident," that he "offered her at least four times to call 9-1-1 or the local police department," and that she "told him no." Id.

In a footnote in his appellant's brief, Lindsey states that, at the hearing before the Merit Board, the City offered the March 31, 2010 report as an exhibit at the hearing, that Lindsey objected to its admissibility as hearsay because K.J. did not appear at the hearing, and that the objection was sustained. Appellant's Brief at 14-15 n.1. We note that the transcript of the hearing shows that the Merit Board, by counsel, "sustain[ed] the objection to the extent that these documents pertain to statements having been made by [K.J.]" and would "allow admission of [] Lindsey's statement." Merit Board Transcript at 68.

We observe that many of the statements in the March 31, 2010 report are cumulative of or similar to statements made by Lindsey during his testimony before the Merit Board, namely, that K.J. did not initially respond to Lindsey after she fell to the floor, that after a few seconds K.J. was crying and extremely upset, that K.J. made a comment about being knocked unconscious, and that Lindsey did not provide or seek medical assistance. We further observe that it is not entirely clear whether the statements in the report that "she told him she had been knocked unconscious" and "[s]he did not believe him" are statements attributable to K.J. or to Lindsey. We also observe that Lindsey cites to the report in the argument section of his appellant's brief and states that he attached the March 31, 2010 report to his brief in support of his petition for judicial review. Lindsey was not denied a full and fair hearing before the Merit Board, and, as we conclude above, the Merit Board's decision with respect to Count IV is supported by substantial evidence, even without consideration of any of the statements in the March 31, 2010 report which may be attributable to K.J.

21

and the Department's patrol vehicles had been stolen from his unlocked personal vehicle. He made a report regarding the theft to the Vermillion County Sheriff's Department and left a handwritten note for Chief Stoffel stating that the keys were taken from his vehicle.

The Indiana Supreme Court has observed that "[f]rom the very nature of a policeman's duties, his conduct in the community on and off duty must be above reproach." Fraternal Order of Police, Local Lodge 73 v. City of Evansville, 559 N.E.2d 607, 609 (Ind. 1990) (citing Pope v. Marion Cnty. Sheriff's Merit Bd., 157 Ind. App. 636, 646, 301 N.E.2d 386, 391 (1973)). Further, "[n]o cause is a legal cause for removal of a police officer unless it bears some relation to the officer's fitness for holding office or his incapacity to discharge his duties." Town of Highland v. Powell, 168 Ind. App. 123, 128, 341 N.E.2d 804, 808 n.7 (1976); see also City of North Vernon v. Brading, 479 N.E.2d 619, 624 (Ind. Ct. App. 1985) (noting that a cause for dismissal must bear "a legal relation to the policeman's fitness for holding the position, or his incapacity to discharge its duties"), reh'g denied, trans. denied.

Here, the trial court specifically found that the Merit Board's decision with respect to each count bears a reasonable relation to Lindsey's fitness or capacity to hold his position. With respect to Count II, the court found that "[t]he very nature of Lindsey's employment as a police officer places him consistently in the eyes of the public and he must exercise sound judgment for the good of the department" and that "Lindsey did not exercise sound judgment when he chose to disobey Indiana traffic laws while expecting others to follow them." March 22, 2012 Order of the Trial Court at 8-9. With respect to Count IV, the court found that "Lindsey's conduct constituted conduct unbecoming an

22

officer when [he] struck or pushed [K.J.] off the bed, rendering her unconscious and/or incapacitated, and in further failing to provide or obtain medical care," that "[a] reasonable relationship exists between Lindsey's conduct and his fitness to hold his office as Lindsey's conduct must be above reproach whether he is on duty or off duty," that "Lindsey was not exercising sound judgment when he failed to obtain medical assistance for [K.J.]," and that "Lindsey's conduct toward [K.J.] has a direct relation to his reputation as a police officer within the community." Id. at 9.

With respect to Count V, the court found that Lindsey's "failure to follow the orders of Chief Stoffel and Assistant Chief Whallon, which was in direct disobedience of an order of a superior, has a direct effect on his fitness and capacity to hold his position as a police officer" and there is a "reasonable relation between an officer's fitness to hold his office and his ability to follow the orders of his commanding officers." Id. With respect to Count VI, the court found that Lindsey was "not exercising the sound judgment required of a police officer" at the time he left his keys in an unlocked vehicle and that there is "a reasonable relation between Lindsey's ability to maintain the security of his police department and other patrol vehicles by properly securing his [Department] issued keys and his capacity to discharge his duties." Id. at 10.

We cannot say that the court's findings with respect to whether a reasonable relationship exists between Lindsey's conduct and his fitness to hold office or his capacity to discharge his duties are patently unreasonable, made without consideration of the facts and in total disregard of the circumstances, or lack any basis that might lead a reasonable person to the same conclusion.

In addition, as to Lindsey's assertion that the Department may not discipline him on the basis of off-duty personal or sexual relationships, we note that, while a police officer's private life or relationship may be beyond the scope of a reasonable investigation under certain circumstances such as where there is no or a tenuous relationship between an officer's relationship and his duties, we cannot say that all aspects of an officer's private life or conduct when the officer is off-duty may never be considered in determining whether the officer engages in conduct unbecoming an officer, provided that there is a reasonable relation to the officer's fitness or capacity to hold his position. As noted above, the court's findings that such a reasonable relation exists in this case are not arbitrary and capricious.

With respect to Lindsey's argument that the interview with Assistant Chief Whallon was "tainted," we observe that when asked to explain when he first became involved in the internal investigation, Assistant Chief Whallon testified "I was advised by Chief Stoffel that a battery had taken place in Florida," that "[h]e told me that the person in question would have been [] Lindsey," and that "[h]e advised me that his girlfriend at the time had been battered [and] came in and filed an official complaint . . . ." Merit Board Transcript at 211-212. Assistant Chief Whallon then testified as to an overview of the steps he took in performing the internal investigation and identified the persons he interviewed. Assistant Chief Whallon testified that he spoke with K.J. about the incident, that he "left her the information to make sure that she took the right steps to make sure *if a battery in fact did take place* that since it happened in Florida she followed the correct procedures," that he "advised [K.J.] that [he] would be doing . . . an internal investigation

*on whether or not the incident took place,*" and that he took a recorded statement from K.J. Id. at 213 (emphases added). Assistant Chief Whallon further testified that he took a recorded statement from Lindsey and prepared findings. Based upon our review of the testimony before the Merit Board, we cannot say that Chief Stoffel's statement that a battery had taken place in Florida tainted the entire internal investigation or that Assistant Chief Whallon was biased in performing the investigation.

We do not reweigh the evidence and may not substitute our judgment for that of the administrative body. See Davidson, 696 N.E.2d at 61. Based upon our review of the record before the Merit Board and the trial court, we conclude that the decision of the Merit Board was based on relevant evidence as reasonable persons might accept as adequate to support the conclusion and is not patently unreasonable or made without consideration of the facts and in total disregard of the circumstances.

We cannot say that Lindsey satisfied his burden of demonstrating that the trial court's decision affirming the Merit Board's determination was arbitrary and capricious or unsupported by substantial evidence.

Accordingly, we affirm the trial court's ruling.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.